IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Donna Ward, ) | |
| ) | Civil Action No. 8:04-22200-TLW-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for DIB and SSI on February 11, 2002, alleging a disability date onset date of February 12, 2002. The applications were denied initially and upon reconsideration. The plaintiff requested a hearing, which was held on July 1, 2003. The plaintiff appeared at the hearing with her attorney. A vocational expert also testified. The ALJ

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

denied the plaintiff's application on March 15, 2004 and the Appeals Council denied the plaintiff's request for a review on June 25, 2004. In making his determination that the plaintiff was not entitled to benefits, the ALJ made the following findings (verbatim):

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 2 16(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability on February 12, 2002.

3. The claimant's residuals of cervical discectomy and fusion, right rotator cuff tear, pain in the neck, mid back and low back, irritable bowel syndrome, gastroesophageal reflux disease, a depressive disorder and an anxiety disorder are considered "severe" in combination based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not fully credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform simple, light, unskilled work activity with a sit/stand option, with no crawling, crouching, climbing, squatting or kneeling, and with no use of the upper extremities for work above shoulder level.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school equivalent education" (20 CFR §§ 404.1564 and 416.964).

10. Transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.  Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, and based on the testimony of the vocational expert, there are a significant number of jobs in the national economy that she could perform.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

## **EVIDENCE PRESENTED**

The plaintiff was born on November 18, 1956; she was 45 years old at the time of her alleged onset of disability and 47 years old at the time of the ALJ's decision (Tr. 38). She has a GED and two years of college, and has worked in the vocationally relevant past as a Medicaid specialist, a clothes presser, a bar tender, a front desk clerk, a food stamp processor, a housekeeper for a retirement community, and a certified nurse's aide (Tr. 40 - 43). The plaintiff alleged she became disabled on February 12, 2002, due to "C4-5 and C5-6" disc problems in her neck, a right rotator cuff tear, anxiety attacks, arthritis and degenerating discs causing an inability to sit for any period of time (Tr. 98).

**A. Medical Evidence**

From March 1999 through November 2000, the plaintiff was treated by Dr. Danette F. McAlhaney for complaints of gastroesophageal reflux disease (GERD), panic attacks, knee pain, right flank pain, right shoulder pain, urinary tract infections and other various illnesses (Tr. 341-363).  In 2001, Dr. McAlhaney treated the plaintiff for anxiety and depression with Effexor and Paxil, though the plaintiff reported no relief of her symptoms (Tr. 331).  Dr. McAlhaney also treated the plaintiff for a "burning pain" in her lower back, leg cramps, muscle spasms and left shoulder stiffness (Tr. 325-330).

3

On January 16, 2002, Dr. McAlhaney noted that the plaintiff continued to complain of muscle spasms, although she was not in any acute distress. Dr. McAlhaney continued the plaintiff on muscle relaxants (Tr. 324). An MRI of the cervical spine taken on February 1, 2002, revealed moderately severe degenerative "disc/osteophyte" disease of the cervical spine with disc protrusion, giving rise to an impingement on the spinal cord at C4-5, C5-6 and C6-7, and moderate to moderately severe foraminal stenosis at several levels on the right and left side (Tr. 155-156).

On February 8, 2002, the plaintiff was examined by Dr. Richard C. Mendell for complaints of neck pain radiating to her arms (Tr. 182-184). The plaintiff stated that she had been treated by a chiropractor on a weekly basis but felt that her neck pain was getting worse (Tr. 182). Dr. Mendell's physical examination revealed that the plaintiff was able to walk on her heels and toes and walk in a heel-toe tandem gait without any trouble (Tr. 182). Her range of motion at the wrist was normal and poor in the neck (Tr. 182-183). There was no atrophy in any limb, sensation was intact in the arms and legs, and straight leg raising tests were negative. She had good muscle strength and deep tendon reflexes. Dr. Mendell started the plaintiff on Valium and Elavil and scheduled her for a myelogram and post myelogram CT (Tr. 182 -184).

On February 14, 2002, Dr. Mendell noted that the plaintiff's myelogram and post-myelogram CT showed three-level cervical spondylosis, worse at C4-5 and C5-6. Dr. Mendell indicated there was no evidence of any disc herniation or nerve root compromise in the lumbar spine. He recommended performing a two-level anterior cervical discectomy (Tr. 181). Surgery was performed on February 18, 2002.

On February 28, 2002, treatment notes from Dr. Mendell indicated that the plaintiff was two weeks status post-surgery, and that she had no neck pain; however, she had a lot of "burning pain" across her shoulders. Dr. Mendell thought the burning would abate

relatively quickly. He switched the plaintiff's medications and scheduled her for a follow-up appointment (Tr. 179).

On March 19, 2002, Dr. Mendell noted that the plaintiff was feeling much better than before the surgery and that her wound was healing well, but she was complaining of difficulty swallowing solid foods . Dr. Mendell noted that cervical spine films did not indicate a neural impingement on the back of the throat and that this problem often occurred in smaller-statured individuals. Dr. Mendell scheduled the plaintiff for a consultation to evaluate her swallowing problems (Tr. 180).

On April 25, 2002, Dr. Mendell's treatment notes indicated that the plaintiff's neck pain had improved but that she was suffering from hoarseness, numbness of the throat and difficulty swallowing (Tr. 178). On May 16, 2002, Dr. Mendell indicated that the plaintiff's chief complaint was difficulty swallowing. He referred her to an ear, nose and throat specialist (Tr. 177).

On May 23, 2002, the plaintiff was evaluated by Dr. Ralph E. Moore III for complaints of worsening neck pain and difficulty swallowing. Dr. Moore's physical examination showed burning dysesthesias in the cervical paraspinous muscles extending into the trapezius and rhomboid areas. The plaintiff had "relatively good [upper extremity] strength" and no specific radicular weakness, with intact deep tendon reflexes of the biceps, triceps and forearms. The plaintiff also had "good" shoulder internal and external rotation and elbow flexion and extension. Dr. Moore opined that the plaintiff's pain sounded like radicular pain, and that she had a significant limitation in the movement of her cervical spine, with a hyperlordotic curve in the lower area of the cervical spine and with a relative forward projection of the C-spine. Dr. Moore further opined that additional surgical intervention might be necessary (Tr. 186-187).

An MRI performed on May 24, 2002, showed a status post C4-5 and C5-6 anterior cervical discectomies, with fusion and anterior instrumentation; mild to moderate

spondylosis of the C6-7, with bilateral neural foraminal stenosis and minimal central stenosis; mild degenerative narrowing of the C6-7 intervertebral disc; and no evidence of an intramedullary lesion (Tr. 188).

On May 29, 2002, the plaintiff was examined by Dr. Jeffrey Reuben for neck pain and difficulty swallowing. Examination showed essentially no range of motion of the neck due to pain; adequate range of motion of her shoulder, elbows, wrists, hips, knees and ankles without pain; muscle strength against gravity; symmetrical and 2+ deep tendon reflexes; and intact sensation to pinwheel and light touch. X-rays revealed no loosening of the cervical instrumentation and that the grafts looked "ok[ay]". Dr. Reuben noted that although there was no solid fusion yet, there were no signs of definite nonunion and no instability of the instrumentation was noted on flexion and extension. An MRI indicated moderate spondylosis at C6-7 with some "very" mild bilateral neuroforaminal stenosis and minimal central stenosis; mild degenerative changes at C6-7; and no evidence of "intermedullary lesion" or "diskitis". Dr. Reuben opined that the plaintiff's smoking could increase her symptomatology and chances of a nonunion. He concluded that surgical intervention was not indicated unless there was obvious nonunion (Tr. 191-193).

On June 21, 2002, the plaintiff was examined by Dr. Kenneth A. Brown, a board-certified otolaryngologist in head and neck surgery. Examination revealed no mucosal lesion in the oral cavity or pharynx, a symmetrical gag, a "perfectly" normal larynx and no evidence of vagal nerve injury. Dr. Brown recommended a radiographic exam of the esophagus and/or an EGD (Tr. 196-197). The plaintiff was also seen that same day by Dr. Karen M. Eller, a pain specialist. The plaintiff told Dr. Eller that she had tried multiple short-acting analgesics and that she did not want to try them anymore, nor did she want to try steroids injections because they caused anxiety. Dr. Eller noted that the plaintiff continued to work full-time and showed no signs of depression. An examination revealed pain to palpation in the cervical region, with "intense pain to even mild palpation in the [trapezius

6

muscle] region"; "good" strength in all major muscle groups; 2+ reflexes at the biceps, triceps, and brachial radialis; a normal sensory examination; no sensory deficits in any dermatomal distribution; and intact neurological findings in the upper extremities.  Dr. Eller told the plaintiff that she thought the Pain Management Center could help her, through medication and other therapy, and she recommended smoking cessation to assist in the delivery of oxygen for the healing process, and that the plaintiff retry Zanaflex (a muscle relaxant) and a nonsteroidal medication (Tr. 230 - 232).

On June 25, 2002, Dr. Steven C. Poletti examined the plaintiff and noted that her grip strength was diminished, but there was no focal weakness and her lower extremity reflexes were normal.  An x-ray revealed that the graft was in "good" position, and that the fusion was "in all likelihood" solid.  Dr. Poletti opined that physical therapy and pain management might be helpful.  He did not recommend further surgery, since it might require a multi-level fusion (Tr. 204).

On July 10, 2002, the plaintiff returned to Dr. Eller for a follow-up appointment. The plaintiff reported that she had stopped taking the narcotic analgesics because of significant itching; however, she continued taking her Darvocet.   Dr. Eller initiated a trial of methadone (Tr. 228 - 229).

On August 5, 2002, Dr. Donald W. Hinnant, a state agency psychologist, reviewed the plaintiff's file and completed a Psychiatric Review Technique form (PRTF).  Dr. Hinnant opined that the plaintiff did not have a severe mental impairment, and that her anxiety-related disorders created only mild restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (T. 157-170).

On August 14, 2002, Dr. Eller noted that the plaintiff was tolerating her methadone, and that her pain had changed a "little bit". The plaintiff, however, reported more numbness and heaviness in her upper shoulder, arms and lower extremities. An examination

revealed good range of motion of the neck; an intact neurological examination; good strength in all the major muscle groups; 2+ reflexes at the biceps, triceps and brachioradialis; and grossly intact senses. The plaintiff complained of side effects, including constipation, from her methadone regimen, so Dr. Eller did not increase the dosage. Dr. Eller's assessment was "45 year old female with bilateral shoulder pain with related cervical spine disease" (Tr. 226 -227).

On August 29, 2002, a state agency medical consultant reviewed the plaintiff's record and completed a physical RFC assessment form. This medical consultant found that the plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull without limitations; climb ramps and stairs; balance, stoop, kneel, crouch and crawl occasionally; and never climb ladders, ropes, or scaffolds. The state agency medical consultant also found that the plaintiff could reach overhead only occasionally, and could not engage in extreme neck movements (Tr. 213-220).

On September 4, 2002, Dr. Eller noted that the plaintiff was in no acute distress, had stopped taking methadone for her pain and did not want to take any narcotics for her pain because they made her too sedated, caused other side effects, and did not help the pain. Dr. Eller noted that the plaintiff was in pretty "good" spirits, her manner and affect were appropriate and normal, and that she was in no acute distress, though she reported her pain was a 9 (out of 10) on average. Dr. Eller put the plaintiff on a muscle relaxant with "minimal sedating components" and suggested trigger point injections (Tr. 224 -225).

On September 12, 2002, Dr. McAlhaney noted that the plaintiff was being seen in the pain clinic and had stopped taking her Effexor and all pain medications. Dr. McAlhaney diagnosed the plaintiff with chronic pain, panic attacks and muscle spasms. She prescribed Ativan (an anti-anxiety medication) and Zanaflex (Tr. 321).

On October 9, 2002, Dr. Eller noted no gross sensory deficits, 3+ reflexes of the right triceps and brachioradialis, 2+ reflexes in the right biceps, 1+ reflexes in the left upper extremity, and 2+ reflexes for the lower extremities. The plaintiff had "good" strength in all of her major muscle groups. She was complaining of radiating pain into her lower extremities, as well as continued complaints of difficulty swallowing. Dr. Eller discussed various treatments with the plaintiff, including trigger point injections and different medications (Tr. 222 - 223).

Treatment notes for Dr. McAlhaney dated October 17, 2002, indicated that the plaintiff had stopped taking her Zanaflex because it "didn't help" and that she was still not taking her Effexor. Dr. McAlhaney diagnosed anxiety and depression and prescribed Zoloft, Elavil and Ativan (Tr. 320).

On January 17, 2003, the plaintiff underwent a "mini mental status" examination performed by Dr. Cashton B. Spivey, at the request of the state agency. The plaintiff reported to Dr. Spivey that she had never been hospitalized for any mental illness but had been treated on an outpatient basis in 1991. The plaintiff also reported that she bathed and dressed herself, cooked on a limited basis, read and performed simple arithmetic calculations, and watched television in her leisure time. Dr. Spivey opined that the plaintiff had "only very mild cognitive impairment[,]" that her insight and judgment were good, and that she was capable of engaging in abstract reasoning abilities. Because the plaintiff was unable to recall any of three objects after a five minute interval, Dr. Spivey also opined that the plaintiff had an impairment in short-term auditory memory functioning. He diagnosed the plaintiff with major depressive episode, generalized anxiety disorder and panic disorder with agoraphobia. He assigned her a Global Assessment of Functioning (GAF) score of 45 (Tr. 273-276).

On February 28, 2003, Dr. Judith M. Von, a state agency psychologist completed a Psychiatric Review Technique form (PRTF) (Tr. 277-290). Dr. Von opined that

Plaintiff had moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Dr. Von also completed a mental RFC assessment and opined that plaintiff had no cognitive limitations. Dr. Von also opined that the plaintiff was moderately limited in her ability to complete a normal workweek, moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, moderately limited in her ability to interact appropriately with the general public, and moderately limited in working with others, but was capable of appropriate interactions with others, particularly if the interactions were brief and superficial (Tr. 277-293).

On March 3, 2003, Dr. George T. Keller, III, a state agency medical consultant found that the plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and push and/or pull without limitations. Dr. Keller also opined that the plaintiff could frequently balance, stoop, kneel and crouch; occasionally crawl and climb ramps and stairs; never climb ladders, ropes or scaffolds; and could occasionally reach overhead. Dr. Keller found no communicative, visual or environmental limitations (Tr. 295-302).

From March 14, 2003, through April 9, 2003, the plaintiff was treated by Dr. Edward D. Reed for migraine headaches, hypertension, irritable bowel syndrome, GERD, rotator cuff tear, anxiety and panic attacks. Dr. Reed noted that he was treating the plaintiff's symptoms, and that her hypertension was under control and her irritable bowel syndrome was stable. Treatment notes for Dr. Reed indicated that an examination of the plaintiff's neck and extremities was within normal limits (Tr. 307 - 309).

On June 18, 2003, Dr. Reed wrote a letter addressing the plaintiff's medical condition. He stated:

> Ms. Ward is currently being treated for several medical problems which include: chronic neck pain from herniated vertebral disks,

> arthritis which affects multiple joints, anxiety disorder with panic attacks, chronic abdominal/GI discomfort from Irritable Bowel Syndrome, and right shoulder pain from a rotator cuff tear. All these problems together serve to make it difficult, if not impossible, for Ms. Ward to maintain steady employment. It would be advisable that Ms. Ward curtail her activities to minimize the amount of discomfort she experiences daily.

(Tr. 306A).

> On June 18, 2003, Dr. McAlhaney wrote a letter in which she stated:

> Ms. Ward is a 46 year old female who had a cervical discectomy and fusion of two discs in March 2002. Since that time, she has had persistent numbness and burning sensation of her upper extremities. She complains of chronic neck, shoulder, and low back pain and uses analgesics, Darvocet N-100, for control of the pain as well as a stronger analgesic that is prescribed by the pain clinic. She has received treatment at a plain clinic and had course of physical therapy; however, she continues to be symptomatic. She is unable to sit or stand for more than one hour at a time. Patient also has a history of depression and panic attacks.

(Tr. 303).

### B. Hearing Testimony and Other Statements

At the July 1, 2003 administrative hearing, the plaintiff testified that she left her last job as a Medicaid specialist because her neck pain was interfering with her work (Tr. 42-43). She stated that she had problems with her neck for a few years (Tr. 48). The plaintiff testified that since her surgery in February, 2002, she had burning and spasms in her shoulder muscles and that her shoulder muscles had become hard (Tr. 44). She also testified that she had lost over 50 pounds since the surgery (Tr. 38). The plaintiff also stated that headaches usually followed her muscle spasms about three times a week (Tr. 51). The plaintiff testified that her arms go dead and become very heavy, and that she has problems picking up objects with her right hand (Tr. 49; 51). The plaintiff stated that she had problems with irritable bowel syndrome since 1997 or 1998, which required her to go to the restroom, within seconds, every time she ate (Tr. 49). The plaintiff testified that she had emotional

11

problems, such as "down moods," crying and panic attacks which caused her body to shake and break out into a cold sweat, and that she also had agoraphobia (Tr. 47-48; 52). She stated that she took Lorazepam (Ativan) three times a day for her panic attacks (Tr. 50). She also testified that she had two nervous breakdowns several years ago (Tr. 52). The plaintiff stated that she could stand and sit for about an hour before she started having problems and that she spent most of the day lying down (Tr. 45). She also said that she took mostly Darvocet for pain and that she would take Avinza only when necessary (Tr. 50). The plaintiff stated that she was unable to return to her Medicaid specialist job because she was unable to sit at a keyboard (Tr. 47).

**C. Vocational Expert Testimony**

The ALJ also received testimony from Dr. Arthur Schmitt, a vocational expert (Tr. 53-57). Dr. Schmitt described the plaintiff's past relevant work as a Medicaid specialist as skilled, sedentary work; a clothes presser as unskilled, light work; a front desk clerk as semiskilled, light work; a food stamp processor as semiskilled, sedentary work; a certified nurse's aid as semiskilled, medium work; a bar and grill manager as skilled, light work; and an environment services specialist as unskilled, light work (Tr. 53-54).

> The ALJ asked Dr. Schmitt to assume the following:
>
> . . . a person who is currently age 46, who has a high school and above education, who is limited to the performance of light exertional level work. Wouldn't have to lift any more than 20 pounds occasionally and up to 10 pounds on a more frequent basis. And the job would be unskilled, involving simple operations. Postural limitations, so there would be no crawling or crouching or climbing or squatting or kneeling. Upper extremity limitations, so there wouldn't be any use of the arms for work above shoulder level. And the job would afford the opportunity to alternate between sitting and standing and still allow a person to perform their duties.

(Tr. 54).

In response to the hypothetical posed, Dr. Schmitt testified that such an individual could perform the jobs of tobacco sampler, and carton packer. Dr. Schmitt also

12

testified to the number of jobs available in the regional and national economies. The ALJ also asked Dr. Schmitt, since the DOT did not provide for a sit/stand option, if he were aware whether the jobs could be performed with a sit/stand option. Dr. Schmitt testified that he had observed the jobs performed with a sit/stand option, and that his testimony was consistent with the DOT (Tr. 55). In response to questioning from the plaintiff's attorney, the vocational expert testified that if he were to consider the plaintiff's testimony, in his opinion she would not be employable (Tr. 56).

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

13

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a *prima facie* showing of disability by showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

The plaintiff alleges that the Commissioner erred: (1) by making an improper credibility analysis of the plaintiff and her testimony, in light of the medical evidence in the record; and (2) in failing to find the plaintiff meets or equals the listing of impairments §1.04.

***Plaintiff's Credibility***

The plaintiff contends that the ALJ erred in failing to find her allegations of pain and limited functional capacity to be credible.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

The ALJ found that the plaintiff suffers from numerous medically determinable impairments: residuals of cervical discectomy and fusion, right rotator cuff tear, pain in the neck, mid back and low back, irritable bowel syndrome, gastroesophageal reflux disease, a depressive disorder and an anxiety disorder (Tr. 23-24). The ALJ further found that the testimony of the plaintiff was not fully credible with regard to the severity of her symptoms and the extent of her limitations (Tr. 25).

15

In making his credibility determination, the ALJ found that the plaintiff's subjective complaints were not supported by medical evidence. However, in doing so, the ALJ ignored the extensive medical treatment sought by the plaintiff since her 2001 neck surgery. In fact, a review of the record reveals that the plaintiff has consistently complained of and sought treatment for her pain and other symptoms since her cervical fusion surgery in February 2002, mostly to no avail. The plaintiff's physicians have tried a variety of treatment plans, including injections, methadone, narcotics and cessation of smoking and the plaintiff has generally followed their recommendations. In his findings, the ALJ stated: "it is important to note that the claimant chose whether or not to comply with her physician's suggested treatments", suggesting that the plaintiff was noncompliant with her recommended course of treatment. On occasion, the plaintiff has stopped certain drug treatments because of the side effects of the medication. However, it appears from the record that she has been willing to try new drugs and treatments as prescribed by her doctors (Tr. 226-227). The record simply does not support a picture of a non-compliant patient; rather, it shows a patient who is in constant pain and has received little relief, despite a variety of treatments.

The symptoms and limitations which the plaintiff testified she experienced are reasonably consistent with the medical evidence and the conditions from which she suffers. The reports of the plaintiff's treating physicians clearly indicate that despite being on powerful medication, the plaintiff continued to be symptomatic (Tr. 303; 306A). The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). The opinions of the plaintiff's physicians here are supported by the medical evidence in the record. While diagnostic tests were not performed every time the plaintiff was seen by her doctors, again, it is clear from the records that the plaintiff consistently suffered pain following her surgery. Her testimony regarding her pain and

limitations is supported by the medical testimony and the opinions of her treating physicians. Accordingly, the ALJ erred in finding the plaintiff's testimony as to her limitations to be not credible, as the testimony is not inconsistent with the medical and other evidence. Thus, on remand, the ALJ must appropriately consider the effect of the plaintiff's pain on her ability to function.

***Listing 1.04***

The plaintiff also alleges that the ALJ erred in failing to consider the application of Listing Section 1.04. 20 C.F.R., Pt. 404, Subpt P, App. 1, Subsection 1.04 ("Disorders of the spine").

A claimant who has a severe impairment which meets or equals a listing, and who is not currently engaged in substantial gainful activity, is entitled to disability benefits. *Durham v. Apfel*, 34 F.Supp.2d 1371 (N.D.Ga. 1999); *see also Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984)(noting that a claimant's disability is established if his nonexertional condition is a listed impairment in the regulations). The question on appeal is whether there is substantial evidence to support the finding of the ALJ that the plaintiff's back and neck impairment did not constitute a listed impairment. If her impairment satisfies the medical conditions set forth in the Listings, the plaintiff is considered to be disabled. This section of the Listings provides as follows:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
>    B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful

17

> dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

20 C.F.R. pt 404, subpt. P, app. 1 §1.04A; B.

The plaintiff here presented no evidence of nerve root compression or spinal arachnoiditis as required by the listing. In fact, an MRI prior to the plaintiff's February, 2002 surgery revealed no evidence of any disc herniation or nerve root compromise of her lumbar spine (Tr. 181). Following the surgery, cervical spine films showed no neural impingement (Tr. 180). Treatment notes from this period consistently showed symmetrical and intact deep tendon reflexes (Tr. 186; 192; 204; 226; 231), no significant motor strength loss (Tr. 186; 226; 231), no sensory deficits (Tr. 192; 222; 226; 231) and no evidence of limb atrophy (Tr. 183).

The plaintiff clearly has a condition which results in limitation and pain. However, her impairment does not meet the very specific requirements for disability under Listing 1.04. Based on the foregoing, the ALJ's finding that the plaintiff's impairment did not meet the requirements of the Listings is supported by substantial evidence.

## **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and the claim remanded to the Commissioner pursuant to sentence four of Title 42, United States Code, Section 405(g) for further evaluation as set forth above under the sequential evaluation process.

s/Bruce H. Hendricks
United States Magistrate Judge

November 7, 2005

Greenville, South Carolina